Robert C. Moest, Of Counsel, SBN 62166
**THE BROWN LAW FIRM, P.C.**
2530 Wilshire Boulevard, Second Floor
Santa Monica, California 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

*Counsel for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

YASHASVI PATEL, derivatively on behalf of CONTEXTLOGIC INC.,

    Plaintiff,

    v.

PIOTR SZULCZEWSKI, RAJAT BAHRI, BRETT JUST, JULIE BRADLEY, ARI EMANUEL, JOE LONSDALE, JACQUELINE RESES TANZEEN SYED, STEPHANIE TILENIUS, and HANS TUNG,

    Defendants,

    and

CONTEXTLOGIC INC.,

    Nominal Defendant.

Case No.:

## **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

## INTRODUCTION

Plaintiff Yashasvi Patel ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant ContextLogic, Inc. ("ContextLogic" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Piotr Szulczewski, Rajat Bahri, Brett Just, Julie Bradley, Ari Emanuel, Joe Lonsdale, Jacqueline Reses, Tanzeen Syed, Stephanie Tilenius, and Hans Tung (collectively, the "Individual Defendants" and together with the Company, the "Defendants") for breaches of their fiduciary duties as controlling shareholder, directors, and/or officers of ContextLogic, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding ContextLogic, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by ContextLogic's controlling shareholder, directors, and officers between December 16, 2020 through May 12, 2021, both dates inclusive (the "Relevant Period").

2.      ContextLogic is a Delaware corporation based in San Francisco, California,

1

that operates a global mobile e-commerce platform called "Wish." Wish functions as a marketplace that connects value-conscious consumers with merchants, and the Company generates revenue by charging merchants on Wish a commission on their sales. The Company generates additional revenue through advertising and logistics services offered to merchants on the Wish platform.

3.     ContextLogic's stock became publicly traded through a December 16, 2020 initial public offering ("IPO"), at which time the Company represented that it had in excess of 100 million monthly active users ("MAUs") in more than 100 countries, over 500,000 merchants using its platform, and about 150 million items for sale through Wish.

4.     In its registration statement filed with the SEC in connection with the IPO, which was declared effective on December 15, 2020 (the "Registration Statement"), as well as its prospectus filed with the SEC on December 17, 2021 (the "Prospectus," and together with the Registration Statement, the "Offering Documents"), the Company highlighted a number of its supposed strengths. This included that the Company's "robust user-generated content[] promote[s] *higher quality merchants and products*" which "*allows [ContextLogic] to offer a vast selection of high-quality items* at competitive prices," that the Company's "logistics programs [] provide a set of *reliable cross-border logistics* solutions at competitive costs for our merchants[,]" and that the Company's logistics programs further "provide *faster and more reliable delivery to our buyers.*"

5.     The Offering Documents stated that these "logistics and advertising offerings[,]" with their speed and reliability advantages "ha[ve] driven [merchants'] success on Wish and in turn, our growth." The Company also represented that "the number of MAUs" attracted by the platform's supposed advantages in quality and reliability was "a key driver of revenue growth as well as a key indicator of user engagement and awareness of our brand."

6.     The truth, which would begin to be revealed on March 8, 2021—when the Company filed a current report on Form 8-K with the SEC, issued a press release, and held

an earnings conference call—was that the Company was facing "logistical challenges" which, contrary to the statements in its Offering Documents, created "unfavorable unit economics and a customer experience that did not meet [the Company's] standard." In plainer terms, the Company had, prior to and around the time of the IPO, received numerous complaints from its customer base concerning the quality of the goods sold through Wish, the long delays—sometimes more than two months—between orders and deliveries, and the substantial number of orders that went completely undelivered. These undisclosed headwinds, which existed at the time of the IPO, caused a 10% ***decline*** in MAUs during the fourth quarter 2020.

7.      Following this revelation, the Company's stock price declined $1.83 per share, over a 10% drop, from its previous trading day close of $17.77 per share to close March 8, 2021 at $15.94 per share.

8.      Still, the Company maintained at that time that the then-contracting MAU figure was not indicative of the strong demand the Company was still experiencing.

9.      This, too, was untrue. The Company was not facing strong demand and instead would continue its loss of users. This truth emerged on May 12, 2021, when the Company released its financial results for the first quarter 2021 which revealed that MAUs had declined another 7% and that the Company's projected sales revenue was in decline.

10.     On this news, the Company's stock price declined an additional $3.36 per share, over a 29% drop, from its May 12, 2021 close of $11.47 per share to close May 13, 2021 at $8.11 per share.

11.     Leading up to the Company's IPO and throughout the Relevant Period, the Individual Defendants breached their fiduciary duties to the Company by making, and/or causing the Company to make, materially false and misleading statements and omissions regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) ContextLogic did not enjoy

the advantages in quality, speed, and reliability that it touted; (2) as a result, the Company was not poised to leverage these supposed advantages as a means of continuing to grow its MAU base; (3) therefore, the Company's MAU base was not likely to grow and instead was likely to shrink, as it ultimately did; and (4) the Company failed to maintain adequate internal controls. As a result of the foregoing, ContextLogic's public statements were materially false and misleading at all relevant times.

12.    The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact.  While the price of the Company's shares was artificially inflated due to these uncorrected false and misleading statements, four of the Individual Defendants engaged in insider sales for proceeds in excess of $140 million.

13.    Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

14.    In light of the Individual Defendants' misconduct—which has subjected the Company and each of the Individual Defendants to four federal securities fraud class action lawsuits pending in the United States District Court for the Northern District of California (the "Securities Class Actions"), and further subjected the Company to the need to undertake intake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company, and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

15.    Thus, the Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

16.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective

engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, and of the Individual Defendants' liability in the Securities Class Actions, of their not being disinterested and/or independent directors, a majority of the Company's the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15. U.S.C. § 78j(b)) and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

18.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

19.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

20.     Venue is proper in this District because ContextLogic's principal executive offices are in this District. In addition, a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

21.     Plaintiff is a current shareholder of ContextLogic. Plaintiff has continuously held ContextLogic common stock since December 23, 2020.

22.     Plaintiff is a citizen of California.

### Nominal Defendant ContextLogic

23.     ContextLogic is a Delaware corporation with its principal executive offices at One Sansome Street 40th Floor, San Francisco, California 94104. ContextLogic's shares trade on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "WISH." ContextLogic has two classes of common stock, Class A and Class B, with shares of Class B common stock having twenty votes each compared to shares of Class A common stock having one.

**Defendant Szulczewski**

24.     Defendant Piotr Szulczewski ("Szulczewski") is the Company's founder and CEO. He has been CEO since he founded the Company in July 2010 and also served as Chairperson from August 2020 until May 2021. According to the Company's proxy statement filed on Schedule 14A with the SEC on April 28, 2021 (the "2021 Proxy Statement"), as of April 15, 2021, Defendant Szulczewski beneficially owned 100,037,649 shares of the Company's Class B common stock, which represented 62.9% of the Company's outstanding Class B common stock as of that date and 54.3% of total voting power. Given that the price per share of the Company's common stock at the close of trading on April 15, 2021 was $12.72, Defendant Szulczewski owned more than $1.27 billion worth of ContextLogic stock. In addition, as of April 15, 2021, Defendant Szulczewski had, through certain irrevocable proxies, voting control over an additional 1,999,830 shares of the Company's Class A common stock and 27,441,890 of the Company's Class B common stock. Taken together, as of April 15, 2021, Defendant Szulczewski had control over 69.1% of the Company's voting power, making him a controlling shareholder.

25.     As CEO, Defendant Szulczewski is entitled to substantial compensation from the Company for the fiscal year ended December 31, 2021. For the fiscal year ended December 31, 2020, he received $78,191,786 in total compensation from the Company, including $450,000 in salary and $77,741,786 in stock awards.

26.     During the Relevant Period, when the price of the Company's common stock

was artificially inflated and before the scheme was exposed, Defendant Szulczewski made the following sale of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| February 24, 2021 | 5,373,615 | $19.65 | $105,591,534.75 |

His insider sale, made with knowledge of material nonpublic information, before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

27.    Upon information and belief, Defendant Szulczewski is a citizen of California.

28.    The 2021 Proxy Statement stated the following about Defendant Szulczewski:

Piotr Szulczewski is our Founder, and has served as our Chief Executive Officer since July 2010 and as our Chairperson of the Board since August 2020. Prior to founding the Company, Mr. Szulczewski served in various positions at Google, Inc., a technology company, including as a technical lead and senior software engineer, from April 2005 until January 2009. Mr. Szulczewski holds a B.S. in mathematics and computer science from University of Waterloo. We believe that Mr. Szulczewski is qualified to serve as a member of our Board based on the perspective and experience he brings as our Founder and Chief Executive Officer.

**Defendant Bahri**

29.    Defendant Rajat Bahri ("Bahri") has served as the Company's CFO since December 2016. Defendant Bahri resigning from the Company effective July 23, 2021. According to the 2021 Proxy Statement, as of April 15, 2021, Defendant Bahri beneficially owned 836,992 shares of the Company's Class A common stock and 497,149 shares of the Company's Class B common stock. Given that the price per share of the Company's common stock at the close of trading on April 15, 2021 was $12.72, Defendant Bahri owned approximately $17 million worth of ContextLogic stock.

30.    For the fiscal year ended December 31, 2021, Defendant Bahri was entitled to significant compensation from the Company as CFO. For the fiscal year ended December 31, 2020, Defendant Bahri received $4,517,250 in total compensation from the Company,

including $425,000 in salary and $4,092,250 in stock awards.

31.     During the Relevant Period, when the price of the Company's common stock was artificially inflated and before the scheme was exposed, Defendant Bahri made the following sale of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| February 24, 2021 | 1,443,637 | $19.65 | $28,367,467.05 |
| March 11, 2021 | 300,000 | $18.60 | $5,580,000.00 |

Thus, in total, before the fraud was exposed, he sold 1,743,637 shares on inside information for which he received almost $34 million in proceeds. His insider sales, made with knowledge of material nonpublic information, before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

32.     Upon information and belief, Defendant Bahri is a citizen of California.

33.     The 2021 Proxy Statement stated the following about Defendant Bahri:

Rajat Bahri has served as our Chief Financial Officer since December 2016. Prior to joining the Company, Mr. Bahri served as Chief Financial Officer at Jasper Technologies, Inc., a technology company, from June 2013 until October 2016. Prior to Jasper Technologies, Mr. Bahri spent over eight years as Chief Financial Officer of Trimble Navigation, a publicly traded company. Mr. Bahri began his career at Kraft Foods Inc., where he spent 18 years in various positions, including Chief Financial Officer of Kraft Canada, Inc. and Kraft Pizza Company. Since July 2020, Mr. Bahri has served on the Board of Directors of Pacific Gas and Electric Company. Mr. Bahri holds a Bachelor in Commerce from the University of Delhi and an M.B.A. from the Fuqua School of Business at Duke University.

**Defendant Just**

34.     Defendant Brett Just ("Just") has served as the Company's Chief Accounting Officer since November 2020.  On June 30, 2021, in the same Form 8-K announcing Defendant Bahri's resignation, the Company announced that Defendant Just would serve as Interim co-CFO (with nonparty Jennifer Oliver), until a permanent replace was found.

35.     For the fiscal year ended December 31, 2021, Defendant Just is entitled to

substantial compensation from the Company. For the fiscal year ended December 31, 2020, Defendant Just received substantial compensation from the Company, though the amount was not publicly disclosed.

36.     During the Relevant Period, when the price of the Company's common stock was artificially inflated and before the scheme was exposed, Defendant Just made the following sale of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| February 24, 2021 | 36,901 | $19.65 | $725,104.65 |
| March 15, 2021 | 10,000 | $19.63 | $196,300.00 |

Thus, in total, before the fraud was exposed, he sold 46,901 shares on inside information for which he received over $920,000 in proceeds. His insider sales, made with knowledge of material nonpublic information, before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

37.     Upon information and belief, Defendant Just is a citizen of California.

38.     The Company's June 30, 2021 Form 8-K stated the following about Defendant Just:

> Mr. Just, age 39, will also [in addition to being Interim co-CFO] continue in his role as Chief Accounting Officer, which he has held since November 2020. Prior to taking on these roles, he served as Wish's Controller from August 2019 and as Assistant Controller from September 2017. Mr. Just was previously the Controller for the Internet of Things (IOT) Business Unit at Cisco Systems, Inc. from 2016 to 2017 and Assistant Controller for Jasper Wireless from 2013 to 2016, prior to its acquisition by Cisco in March 2016. Mr. Just began his career in public accounting at Deloitte and Just, Gurr & Associates. He holds a B.S. in Business Economics from the University of California, Los Angeles.

### **Defendant Bradley**

39.     Defendant Julie Bradley ("Bradley") has served as a Company director since October 2020. She also serves as Chair of the Company's Audit Committee.

40.     As a director, Defendant Bradley is entitled to substantial compensation for the fiscal year ended December 31, 2021, including an annual equity award of $270,000

and an additional annual equity retainer of $20,000 as Audit Committee Chair. For the fiscal year ended December 31, 2020, Defendant Bradley received $2,594,419 in compensation from the Company, consisting entirely of stock awards.

41.     Upon information and belief, Defendant Bradley is a citizen of New Hampshire.

42.     The 2021 Proxy Statement stated the following about Defendant Bradley:

Julie Bradley has served on our Board of Directors since October 2020. Ms. Bradley was previously the Chief Financial Officer of TripAdvisor, Inc., a publicly traded online travel planning site, from October 2011 to November 2015. Prior to joining TripAdvisor, Ms. Bradley also served as the Chief Financial Officer of Art Technology Group, Inc., a publicly traded ecommerce software company; as Vice President of Finance for Akamai Technologies, Inc., a publicly traded delivery network, cybersecurity, and cloud service company, from 2000 to 2005; and as an accountant at Deloitte & Touche LLP. Ms. Bradley has served on the board of directors of Wayfair Inc., a publicly traded company, since September 2012, where she is the chair of the audit committee and a member of the governance committee, and GoodRx, a publicly traded company, since September 2020, where she is the chair of the audit committee, and previously served on the boards of other publicly traded companies, which include Blue Apron, Inc. from September 2015 to October 2020, Constant Contact, Inc. from June 2015 to February 2016, and ExactTarget, Inc. from September 2012 to July 2013. Ms. Bradley holds a B.A. from Wheaton College. We believe that Ms. Bradley is qualified to serve as member of our Board due to her extensive public company board experience and her finance experience at publicly traded technology companies.

**Defendant Emanuel**

43.     Defendant Ari Emanuel ("Emanuel") has served as a Company director since November 2019. He also serves as a member of the Company's Nominating and Corporate Governance Committee. According to the 2021 Proxy Statement, as of April 15, 2021, Defendant Emanuel beneficially owned 396,660 shares of the Company's Class A common stock. Given that the price per share of the Company's common stock at the close of trading on April 15, 2021 was $12.72, Defendant Emanuel owned over $5 million worth of

ContextLogic stock.

44.    For the fiscal year ended December 31, 2021, Defendant Emanuel is entitled to significant compensation from the Company as a director, including an annual equity award of $270,000 and an additional annual equity retainer of $5,000 as a member of the Nominating and Corporate Governance Committee.

45.    Upon information and belief, Defendant Emanuel is a citizen of California.

46.    The 2021 Proxy Statement stated the following about Defendant Emanuel:

Ari Emanuel has served on our Board of Directors since November 2019. Mr. Emanuel has served as the CEO of Endeavor Group Holdings, a talent agency, since 2009 following the merger of the William Morris Agency and Endeavor Talent Agency, which he founded in 1995. Prior to founding Endeavor, Mr. Emanuel was a Partner at InterTalent, a talent agency, and a senior agent at ICM Partners, also a talent agency. He began his entertainment industry career at Creative Artists Agency (CAA), a talent agency. He has served as a member of the board of directors of Live Nation Entertainment, Inc. since 2007. Mr. Emanuel holds a bachelor's degree from Macalester College. We believe that Mr. Emanuel is qualified to serve as a member of our Board due to his extensive leadership experience.

**Defendant Lonsdale**

47.    Defendant Joe Lonsdale ("Lonsdale") has served as a Company director since May 2012. He also serves as a member of the Compensation Committee. According to the 2021 Proxy Statement, as of April 15, 2021, Defendant Lonsdale beneficially owned 69,354,796 shares of the Company's Class A common stock, representing 13.8% of the Company's outstanding shares of Class A common stock at that time, and 2.5% of total voting power. Given that the price per share of the Company's common stock at the close of trading on April 15, 2021 was $12.72, Defendant Lonsdale owned over $882 million worth of ContextLogic stock.

48.    For the fiscal year ended December 31, 2021, Defendant Lonsdale is entitled to significant compensation for his services as a director at the Company, including an annual equity award of $270,000 and an additional annual equity retainer of $7,500 as a member of the Compensation Committee.

49.     During the Relevant Period, when the price of the Company's common stock was artificially inflated and before the scheme was exposed, Defendant Lonsdale made the following sale of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|------|------------------|------------------|----------|
| December 18, 2020 | 4 | $24.00 | $96.00 |

His insider sale, made with knowledge of material nonpublic information, before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

50.     Upon information and belief, Defendant Lonsdale is a citizen of Texas.

51.     The 2021 Proxy Statement stated the following about Defendant Lonsdale:

Joe Lonsdale has served on our Board of Directors since May 2012. Mr. Lonsdale is a partner at 8VC, a venture capital firm that he founded in 2015. Previously, he co-founded Palantir Technologies, a global software company known for its work in defense and finance; Addepar, an investment management technology company; and OpenGov, a software company that offers solutions for the public sector. He was a founding partner at Formation8, a venture capital firm with a presence in the U.S. and Asia, and he served as a Principal at Clarium Capital. Mr. Lonsdale holds a B.S. in Computer Science from Stanford University. We believe that Mr. Lonsdale is qualified to serve as a member of our Board due to his extensive experience with technology companies.

**Defendant Reses**

52.     Defendant Jacqueline Reses ("Reses") has served as a Company director since December 2020 and has served as Executive Chair since May 2021. Prior to becoming Executive Chair and during the Relevant Period, she was a member of the Compensation Committee.

53.     For the fiscal year ended December 31, 2021, Defendant Reses is entitled to significant compensation for her role as Executive Chair, including an annual salary of $35,000 and a grant of up to 1,657,000 restricted stock units. For the fiscal year ended December 31, 2020, Defendant Reses received $1,722,205 in compensation from the Company, consisting entirely of stock awards.

54.     Upon information and belief, Defendant Reses is a citizen of California.

55.     The 2021 Proxy Statement stated the following about Defendant Reses: Jacqueline Reses has served on our Board of Directors since December 2020. Ms. Reses previously served as Executive Chairman of Square Financial Services LLC and Capital Lead at Square, Inc., a publicly traded financial services company which provides payments, point of sale, and cashflow management services to small businesses and consumers, from October 2015 until October 2020. From February 2016 to July 2018, Ms. Reses also served as People Lead for Square, Inc. From September 2012 to October 2015, Ms. Reses served as Chief Development Officer of Yahoo! Inc. In this role, she focused on leading partnerships, acquisitions and investments, significant corporate tax transactions, as well as human resources. Prior to Yahoo, Ms. Reses led the U.S. media group as a Partner at Apax Partners Worldwide LLP, a global private equity firm, which she joined in 2001. Ms. Reses serves on the board of directors of Pershing Square Tontine Holdings, Ltd., and Affirm Inc. Ms. Reses is also the chair of the Economic Advisory Council of the Federal Reserve Bank of San Francisco. Ms. Reses previously served on the board of directors of Social Capital Hedosophia Holdings Corp. III, Alibaba Group Holding Limited, and Social Capital Hedosophia Holding Corp. Ms. Reses holds a B.S. in Economics with honors from the Wharton School of the University of Pennsylvania. We believe that Ms. Reses is qualified to serve as member of our Board due to her public company board experience and her experience in various strategic and finance roles at publicly traded finance, ecommerce, and technology companies.

**Defendant Syed**

56.     Defendant Tanzeen Syed ("Syed") has served as a Company director since October 2016 and has served as Lead Independent director since the IPO, in December 2020. He also serves as Chair of both the Compensation Committee and the Nominating and Corporate Governance Committee. According to the 2021 Proxy Statement, as of April 15, 2021, Defendant Syed beneficially owned 16,888,478 shares of the Company's Class A common stock—representing 3.3% of the Company's outstanding Class A common stock at that time—and 1,400,000 shares of the Company's Class B common stock—representing 1.2% of the Company's outstanding Class B common stock at that time. Taken together, this ownership gave Defendant Syed control over 1.6% of the Company's total

voting power as of April 15, 2021. Given that the price per share of the Company's common stock at the close of trading on April 15, 2021 was $12.72, Defendant Syed owned approximately $233 million worth of ContextLogic stock.

57.     For the fiscal year ended December 31, 2021, Defendant Syed is entitled to significant compensation for his role as a director at the Company, including an annual equity award of $270,000 and three additional annual equity retainers of $20,00, $15,000, and $10,000 for his role as Lead Independent Director, Chair of the Compensation Committee, and Chair of the Nominating and Corporate Governance Committee, respectively.

58.     Upon information and belief, Defendant Syed is a citizen of New York.

59.     The 2021 Proxy Statement stated the following about Defendant Syed:

Tanzeen Syed has served on our Board of Directors since October 2016 and as Lead Independent Director since our initial public offering in December 2020. Mr. Syed is a Managing Director at General Atlantic and focuses on investments in General Atlantic's Technology sector. He rejoined General Atlantic in June 2018 after working there from 2006 to September 2013. Prior to rejoining General Atlantic, Mr. Syed was a Director at Temasek, an investment company, from July 2015 until June 2018, where he led U.S. technology growth investments. Prior to Temasek, Mr. Syed was a Vice President at Great Hill Partners from October 2013 to June 2015, where he focused on Internet and software growth investing. Mr. Syed currently serves on the boards of directors of Kiwi.com, s.r.o., an online travel booking platform; and Riskified Ltd., a payment fraud management solution for online merchants, marketplaces, e-travel retailers, digital goods, and services providers; both of which are private portfolio companies of General Atlantic. Mr. Syed holds a B.A. in Economics and Political Science from Macalester College. We believe that Mr. Syed is qualified to serve as a member of our Board due to his extensive experience with ecommerce and technology companies.

### Defendant Tilenius

60.     Defendant Stephanie Tilenius ("Tilenius") has served as a Company director since August 2020. She also serves as a member of both the Audit Committee and the Nominating and Corporate Governance Committee.

61.    For the fiscal year ended December 31, 2021, Defendant Tilenius is entitled to receive significant compensation for her role as a director at the Company, including an annual equity award of $270,000 and two additional annual equity retainers of $10,000 and $5,000 as a member of the Audit Committee and Nominating and Corporate Governance Committee, respectively. For the fiscal year ended December 31, 2020, Defendant Tilenius received $2,616,641 in compensation from the Company, consisting entirely of stock awards.

62.    Upon information and belief, Defendant Tilenius is a citizen California.

63.    The 2021 Proxy Statement stated the following about Defendant Tilenius:

Stephanie Tilenius has served on our Board of Directors since August 2020. She is currently the CEO of Vida Health, Inc., a mobile continuous healthcare platform, which she founded in January 2014. Ms. Tilenius was an Executive in Residence at Kleiner Perkins Caufield & Byers, a venture capital firm, from June 2012 until October 2014, primarily focusing on companies within its Digital Growth Fund. From February 2010 until June 2012, Ms. Tilenius was Vice President of Global Commerce and Payments at Google, Inc., a technology company, where she oversaw digital commerce, product search, and payments. Prior to joining Google, she served in various positions at eBay Inc. from March 2001 until October 2009, ultimately as Senior Vice President of eBay.com and Global Products. Ms. Tilenius was also a co-founder of PlanetRx.com, an online healthcare provider. She currently serves on the board of directors of SeaGate Technology PLC and Tradesy, a privately-held ecommerce company focused on women's fashion, and within the past five years, served on the board of directors of Coach Inc. and Redbubble Limited. Ms. Tilenius holds a B.A. and an M.A from Brandeis University and an M.B.A. from the Harvard Business School. We believe that Ms. Tilenius is qualified to serve as a member of our Board due to her senior executive experience in the consumer Internet and ecommerce sectors, as a company founder and as a board member for other public and private companies.

**Defendant Tung**

64.    Defendant Hans Tung ("Tung") has served as a Company director since January 2014. He also serves as a member of both the Audit Committee and the Compensation Committee. According to the 2021 Proxy Statement, as of April 15, 2021,

Defendant Tung beneficially owned 33,340,640 shares of the Company's Class A common stock, representing 6.6% of the Company's outstanding Class A common stock and 1.2% of total voting power at that time. Given that the price per share of the Company's common stock at the close of trading on April 15, 2021 was $12.72, Defendant Tung owned over $424 million worth of ContextLogic stock.

65.     For the fiscal year ended December 31, 2021, Defendant Tung is entitled to significant compensation for his role as a director at the Company, including an annual equity award of $270,000 and two additional annual equity retainers of $10,000 and $7,500 as a member of the Audit Committee and Compensation Committee, respectively.

66.     Upon information and belief, Defendant Tung is a citizen of California.

67.     The 2021 Proxy Statement stated the following about Defendant Tung:

Hans Tung has served on our Board of Directors since January 2014. Mr. Tung is a Managing Partner at GGV Capital, a venture capital firm, where he has worked since October 2013, in Menlo Park, California. Prior to joining GGV, Mr. Tung was a managing partner at Qiming Venture Partners, a venture capital firm, in Shanghai, China. Mr. Tung began his VC career with Bessemer Venture Partners, a venture capital firm, in Menlo Park, California, and was a former entrepreneur himself and a former technology banker at Merrill Lynch in New York and Hong Kong. Mr. Tung has served on the board of directors of companies including musical.ly, Poshmark (Nasdaq: POSH), StockX, Misfit, Xiaomi, eHi Car Service, Vedantu, and Rupeek. He holds a B.S. in Management Science and Engineering from Stanford University. We believe that Mr. Tung is qualified to serve as a member of our Board due to his extensive experience with ecommerce companies, as well as his experience as a venture capitalist investing in technology companies.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

68.     By reason of their positions as controlling shareholder, officers, directors, and/or fiduciaries of ContextLogic and because of their ability to control the business and corporate affairs of ContextLogic, the Individual Defendants owed ContextLogic and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage ContextLogic in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in

furtherance of the best interests of ContextLogic and its shareholders so as to benefit all shareholders equally.

69.    Each controlling shareholder, director, and officer of the Company owes to ContextLogic and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

70.    The Individual Defendants because of their positions of control and authority as controlling shareholder, directors, and/or officers of ContextLogic, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

71.    To discharge their duties, the controlling shareholder, officers, and directors of ContextLogic were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

72.    Each Individual Defendant by virtue of his or its position as a controlling shareholder, director, and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as controlling shareholder, directors, and officers of ContextLogic, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised ContextLogic's Board at all relevant times.

73.    As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the

dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

74.     To discharge their duties, the officers and directors of ContextLogic were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of ContextLogic were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to ContextLogic's own Code of Conduct and Ethics (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how ContextLogic conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of ContextLogic and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause

independent investigation to be made of, said reports and records;

   (e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that ContextLogic's operations would comply with all applicable laws and ContextLogic's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

   (f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

   (g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

   (h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

  75. Each of the Individual Defendants further owed to ContextLogic and the shareholders the duty of loyalty requiring that each favor ContextLogic's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

  76. At all times relevant hereto, the Individual Defendants were the agents of each other and of ContextLogic and were at all times acting within the course and scope of such agency.

  77. Because of their advisory, executive, managerial, directorial, and controlling positions with ContextLogic, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

  78. The Individual Defendants because of their positions of control and authority,

were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by ContextLogic.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

79.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

80.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

81.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of ContextLogic was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

82.     Each of the Individual Defendants aided and abetted and rendered substantial

assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of their overall contribution to and furtherance of the wrongdoing.

83.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of ContextLogic and was at all times acting within the course and scope of such agency.

## CONTEXTLOGIC'S CODE OF CONDUCT

### ContextLogic's Code of Conduct

84.    In a section titled, "Who Must Follow the Code" the Company's Code of Conduct states its applicability to "[a]ll employees of ContextLogic Inc. (dba Wish) and its subsidiaries, including corporate officers and members of our Board of Directors[.]" Under the 'Purpose and Overview" section, the Code of Conduct explains that it is designed to help these parties "[c]omply with applicable laws, regulations, and company policies," "[p]romote integrity and the highest standards of ethical conduct," and "[a]void even the appearance of anything improper in connection with our business activities."

85.    The section titled, "Complying with Laws and Regulations," of the Company's Code of Conduct continues by stating that the Company "is committed to compliance with all laws, rules, and regulations that apply to our business."

86.    Moreover, under the section titled, "Honest and Fair Dealing, "the Code of Conduct states that the Company and personnel "tell the truth about our services and capabilities and never make promises we cannot keep." It continues by instructing its personnel to "[t]reat others fairly and honestly" and "not take unfair advantage through manipulation, concealment, abuse of privileged or confidential information, misrepresentation, fraudulent behavior, or any other unfair practice."

87.    In a section titled, "Conflicts of Interest," the Code of Conduct provides that

"each of us is expected to use good judgment and avoid situations that can lead to even the appearance of a conflict, which can undermine the trust others place in us and damage our reputation."

88.     In a section titled, "Financial Integrity," the Code of Conduct states, in relevant part:

> The accuracy and completeness of our disclosures and business records is essential to making informed decisions and to supporting investors, regulators, and others. Our books and records must accurately and fairly reflect our transactions in sufficient detail and in accordance with our accounting practices, internal controls, our policies, and the law. Further, all documents filed with the Securities and Exchange Commission (SEC), including financial statements and other financial information, must comply with applicable federal securities laws and SEC rules.

> Some employees have special responsibilities in this area. If you are involved in any aspect of our financial reporting, make sure you meet all applicable procedural and legal requirements. Take care to ensure reports or disclosures about our financial records are full, fair, accurate, complete, objective, and timely, and never falsify or mischaracterize any book, record, account, entry, or transaction that relates to Wish. You must also cooperate fully with Wish's accounting and internal audit departments, as well as Wish's independent public accountants and counsel.

89.     The Code of Conduct further provides, in a section titled, "Insider Trading," the following:

> In the course of business, you may learn confidential information about Wish or about other publicly traded companies that is not available to the public at large. Trading securities while aware of such material nonpublic information, or disclosing such information to others who then trade ("tipping"), is prohibited by various laws.

90.     In addition, the Code of Conduct states, under "Accountability" that: "Violating our Code, our policies, or the law, or encouraging others to do so, exposes Wish to liability and puts our reputation at risk. If an ethics or compliance problem does occur, we expect you to report it so that an effective solution can be developed."

91.     The Individual Defendants violated the Code of Conduct by engaging in or

permitting the scheme to issue materially false and misleading statements to the public, including in the Company's SEC filings, and by facilitating and disguising the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, abuse of control, gross mismanagement, violations of the Exchange Act. Moreover, four of the Individual Defendants violated the Code of Conduct by selling Company shares at artificially inflated prices. Further, in violation of the Code of Conduct, the Individual Defendants failed to conduct business honestly, ethically, and with integrity, failed to maintain the accuracy of Company records, failed to comply with laws and regulations, and failed to report the same.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

92.     ContextLogic is a Delaware corporation based in San Francisco, California, that operates the Wish global mobile e-commerce platform. Wish functions as a marketplace that connects value-conscious consumers with merchants, and the Company generates revenue by charging merchants on Wish a commission on their sales. The Company generates additional revenue through advertising and logistics services offered to merchants on the Wish platform.

93.     ContextLogic's stock became publicly traded through a December 16, 2020 IPO, at which time the Company represented that it had in excess of 100 million MAUs in more than 100 countries, over 500,000 merchants using its platform, and about 150 million items for sale through Wish.

94.     In connection with the IPO, the Individual Defendants made and/or caused the Company to make a number of materially false and misleading statements to the investing public regarding the Company's business, operations, and prospects.

### False and Misleading Statements

#### *The Offering Documents*

95.     The Company's Registration Statement was declared effective on December

15, 2020, the day prior to the IPO closing and the Relevant Period beginning. The Registration Statement was signed by Defendants Szulczewski, Bahri, and Just, and further signed by Defendant Szulczewski on behalf of Defendants Bradley, Emanuel, Lonsdale, Syed, Tilenius, and Tung. On December 17, 2020, the second day of the Relevant Period, the Company filed the Prospectus with the SEC, which formed a part of and incorporated the Registration Statement.  These Offering Documents contained a number of false and misleading statements about the Company.

96.    The Offering Documents highlighted the supposed strengths the Company enjoyed and flagged the use of MAUs as a key metric, stating in relevant part:

> Our business benefits from powerful network effects, fueled by our data advantage and massive scale. As more users join Wish, attracted by our affordable value proposition and shopping experience, we are able to increase revenue potential for our merchants. As more merchants succeed on Wish, more merchants join the platform and grow their businesses with Wish, broadening our product selection, which in turn improves user experience. By developing a strategy focused on users and merchants, we align user and merchant success with the success of our financial model. ***The growth in users and merchants generates more data,*** further strengthens our data advantage and creates an even better experience for everyone on our platform, ***in turn attracting more users and high-quality merchants.***
>
> Our model relies on cost-effectively adding new users, converting those users into buyers and improving engagement and monetization of those buyers on Wish over time as well as adding new merchants, delivering economic success for those merchants, and having those merchants use more of our end-to-end platform.
>
> The following are key elements of our financial model that drive our growth:

- **Increase the scale and growth of our user and buyer base.** Attracting and engaging users have been our key areas of focus since our founding. *We measure our effectiveness in attracting and engaging users through metrics such as our MAUs, which increased over 33% from the nine months ended September 30, 2019 and to the nine months ended September 30, 2020,* as well as the average minutes spent per visit by user. These increases have primarily been driven by the growing popularity and recognition of our brand and platform, the user preferences for our differentiated mobile shopping experience, wide selection of attractively priced products, and the success of our promotional and marketing campaigns. *This growth has contributed to making Wish the most downloaded global shopping app for each of the last three years* according to a report from Sensor Tower. *As a result, we have experienced significant revenue growth in recent periods.* We will need to continue to invest in our marketing efforts to attract additional users and buyers and to enhance our brand and drive user engagement, and over time we will need to do this cost-effectively in order to achieve profitability.

(Italicized emphasis added and footnote removed.)

97. The Offering Documents continued by highlighting the Company's many MAUs as well as some of its supposed competitive advantages, and postured as if the Company was therefore well-positioned to "drive additional growth", stating in relevant part:

*We have become one of the largest and fastest growing global ecommerce platforms, connecting more than 100 million monthly active users in over 100 countries to over 500,000 merchants offering approximately 150 million items.* Our platform combines technology and data science capabilities, an innovative and discovery-based mobile shopping experience, a comprehensive suite of indispensable merchant services, and a massive scale of users, merchants, and items.

\*          \*          \*

Our scale, combined with our extensive data science capabilities, provides us with a unique competitive advantage and is core to our business operations. *We collect, analyze, and utilize data* across over 100 million monthly active users, over 500,000 merchants, and approximately 1.8 million

items sold per day *to improve the shopping experience for users and the selling experience for merchants.* Our proprietary algorithms analyze a rich and growing data set of transactions and historical behaviors of both users and merchants to drive continuous optimization on the platform and inform key business decisions on a daily basis. *Our data science* enables personalization at the individual user level at a massive scale and *drives significant advantages* across all aspects of our business operations*, including user acquisition, user experience,* pricing strategies, user-generated content, merchant insights, and user and merchant support. For example, our user acquisition strategies utilize our data science capabilities to make decisions on what to show to whom, when, and through which acquisition channel, with a focus on maximizing our return on marketing investment and user conversion. *We also leverage our data and unique insights to extend our platform outside of our core business and drive additional growth opportunities*, including new services to merchants and new categories for users.

(Emphasis added.)

98.    The Offering Documents also showed a graph indicating the growth in MAUs the Company had enjoyed over the past five years which showed an upward trend without any disclosure of the then-known reasons that this trend was likely to pause or even reverse in the near future.  The graph is pictured below:



99.    The Offering Documents also highlighted certain purported advantages of the

Wish platform, as follows:

> ***Our global ecommerce platform connects over 100 million monthly active users in over 100 countries to over 500,000 global merchants.*** We seek to democratize ecommerce by making the Wish platform affordable, open, and accessible to all users and merchants worldwide. We do this through our relentless focus on product, technology, and data science. ***For our users, we are revolutionizing the mobile shopping experience*** by making it affordable, personalized, and entertaining. ***For our merchants, we offer immediate, cost-efficient access to our global user base***, scaled data, and technology platform, as well as a comprehensive suite of indispensable services to help run their businesses and drive sales. To serve our global and diversified user and merchant base, we approach our platform development with a specific geographic focus, tailoring key features to solve for the needs of that locality, and enabling an authentic, localized experience.

(Emphasis added.)

100.    Moreover, the Offering Documents highlighted the Company's plan to "Grow

Our Base of Users," enumerating the Company' supposed plan, in relevant part, as follows:

- **Continue to Acquire New Users. *We are focused on growing our user base around the world.*** We currently serve users in over 100 countries. We estimate that there are over 1 billion households with income of less than $75,000 around the world, excluding China and India.
- **Drive User Conversion.** We have over 12 million monthly active buyers and over 100 million monthly active users on the platform. ***We will continue to drive greater user engagement and convert more active users on our platform to become active buyers by utilizing our data science and introducing more interactive and entertaining features.***
- **Drive Profitable Lifetime Value from Existing Users.** We plan to continue to improve the engagement and monetization of our users on our platform to maximize their lifetime value. We plan to achieve this goal by:
    - Using our data science to drive personalization of our platform;
    - Continuing to offer attractive discounts and value, an entertaining user experience, and robust user-generated content; and
    - I***mproving our ease of use by investing in our user support and***

> *logistics infrastructure to enable faster deliveries and localization of our platform.*
> - **Expand Geographically.** We intend to continue to expand our global footprint and enter new geographies and acquire new users in those markets.

(Italicized emphasis added and footnote removed.)

101.   The Offering Documents continued by describing other strengths, such as quality, which would attract consumers and merchants, for example that:

> The merchants on our platform offer primarily unbranded products that can be discounted in excess of 85% as compared to branded alternatives across a number of categories. *We have a number of policies which*, in combination with our robust user-generated content, *promote higher quality merchants* and products on our platform. This *allows us to offer a vast selection of high-quality items* at competitive prices, a value proposition that attracts more than 100 million monthly active users to our platform.

(Emphasis added and footnote removed.)

102.   In addition, specifically with regard to merchants, the Offering Documents touted the Company's having "developed a number of logistics programs" and having "established relationships with national postal networks and formed partnerships with third-party carriers" which together "*provide a set of reliable cross-border logistics solutions* at competitive costs for our merchants." (Emphasis added.) This putative capability was held out as "expand[ing] product selection to provide more diversified products at competitive price points to [Wish] users."

103.   Not surprisingly the Offering Documents maintained that the Company would be able to further deliver on these supposed strengths, stating that the Company planned "to continue to expand our logistics platform and optimize our proprietary logistics programs. Through strategic partnerships with selected regional postal networks and commercial logistics partners, *we aim to become an integrated part of the cross-border logistics value chain with our own logistics services and provide faster and more reliable delivery to our buyers.*" (Emphasis added.)

104.   The Offering Documents also highlighted the Company's "sales and marketing capabilities" which "represent a core competency that is essential to the success of the Wish platform" and which the Company describes, later in the Offering Documents, as a means to "***acquire new users*** and re-engage existing users[.]" This "user acquisition expertise," by the Company's own admission, "will need to continue to [be] invest[ed] in . . . to ***attract new users and increase user engagement***." The Offering Documents further emphasized that the Company's "data-driven sales and marketing strategy and lean and highly-efficient operations have allowed [the Company] to reduce [its] net losses from $207 million in 2017 compared to $129 million in 2019" and emphasized the Company's purported belief that it would "***be able to take advantage of economies of scale to further improve [the Company's] operational efficiency***." (Emphasis added.)

105.   The Offering Documents also illustrated the following trend in MAU growth over time:

| | Year Ended December 31, | | | | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | 2015 | 2016 | 2017 | 2018 | 2019 | 2019 | 2020 |
| | (in millions, except percentages) | | | | | | |
| Monthly Active Users ("MAUs") | 21 | 30 | 49 | 73 | 90 | 81 | 108 |

106.   The Offering Documents contained statements which indicated that this trend should continue, including statements that the Company would expanding its "global footprint and enter new geographies and acquire new users in those markets" and "[i]n particular, countries in Africa, Latin America, and Eastern Europe" which the Company identified as "key growth markets with large and growing populations as well as a significant portion of the population with lower average household incomes."

107.   The many assertions contained in the Offering Documents, identified in ¶¶ 97–107, which highlighted the purported strengths the Company enjoyed from its logistics platform—including high-quality products and merchants and fast and reliable delivery—the past growth in MAUs, and the Company's planned expansions to drive this number even higher were false and misleading given that the Company failed to disclose, *inter alia*, that: (1) ContextLogic did not enjoy the advantages in quality, speed, and

reliability that it touted; (2) as a result, the Company was not poised to leverage these supposed advantages as a means of continuing to grow its MAU base; and (3) therefore, the Company's MAU base was not likely to grow and instead was likely to shrink, as it ultimately did. In fact as of December 2020 when the Offering Documents were filed, the Company was already experiencing this lack of growth, and yet still did not disclose this material information.

## **The Truth Begins Emerging but the False and Misleading Statements Continue**

### *March 8, 2021 Disclosures*

108.   On March 8, 2021, ContextLogic filed a current report on Form 8-K with the SEC, issued a press release, and held an earnings conference call with investors to announce the Company's financial results for the fourth quarter and full fiscal year 2020. The press release revealed that "***MAUs declined 10% YoY [year-over-year] during Q4 to 104 million, primarily in some emerging markets outside of Europe and North America*** where Wish temporarily ***de-emphasized advertising and customer acquisition*** as the company worked through ***logistics challenges*** it faced earlier in the year." (Emphasis added.) Thus, despite the Offering Documents touting, less than three months prior, the Company's plan for growth—and in particular its plan for growth in emerging markets in Africa, Latin America and Eastern Europe—the Company announcing that it as losing users and in particular was not gaining users in the exact geographies it claimed to have been targeting.

109.   On a phone call the same day, Defendant Bahri disclosed that this contracting MAU figure was the result of "***logistical challenges***" which, contrary to the statements in its Offering Documents, created "***unfavorable unit economics and a customer experience that did not meet [the Company's] standard.***"

110.   *Bloomberg* reported on this news in an article titled "Wish Revenue Beats Estimates, Worries Linger about Growth." In the article, *Bloomberg* reported that the

Company had, prior to and around the time of the IPO, received numerous complaints from its customer base concerning the quality of the goods sold through Wish, the long delays—sometimes more than two months—between orders and deliveries, and the substantial number of orders that went completely undelivered. The article noted investors' concern with regard to "the decline in the website's users" and in particular that "WISH [disclosed it] had 104 million MAU[s] in fourth quarter, down 10% from the same period a year earlier." Moreover, the article noted the developments which led to the Company's de-emphasis on certain key geographies by describing how "delivery times [] stretched out longer than two months in some cases [which] made the customer experience so bad the company pulled back ads in India, Brazil, the Philippines and other countries." These experiences, occurring in the fourth quarter 2020, directly contradicted the Company's representations in its Offering Documents, filed in the fourth quarter 2020, about the Company's supposed strengths and thus potential for growth.

111.    Following this revelation, on March 8, 2021, the Company's stock price declined $1.83 per share, over a 10% drop, from its previous trading day close of $17.77 per share to close March 8, 2021 at $15.94 per share.

### *March 25, 2021 Annual Report*

112.    The above damaging disclosures did not prevent the Company from continuing to represent that it would experience more MAU growth. On March 25, 2021, the Company filed with the SEC its annual report for the fiscal year ended December 31, 2021 on Form 10-K (the "2020 10-K"). It was signed by Defendants Szulczewski, Bahri, Just, Bradley, Emanuel, Lonsdale, Reses, Syed, Tilenius, and Tung and contained certifications, signed by Defendants Szulczewski and Bahri, pursuant to Rules 13a-14(a) and 15d-14(a) promulgated under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") attesting to the accuracy of the financial statements contained in the 2020 10-K, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

113.   The 2020 10-K repeated certain claims about the Company's strengths and potential for growth, including, in relevant part, that:

> We also built Wish to empower merchants around the world. Today, most of our merchants are based in China. We initially grew our platform focusing on merchants in China due to these merchants' strength in selling quality products at competitive prices. ***We continue to expand our merchant base around the world.*** Through our diversified and global merchant base, we are able to offer greater depth and breadth of categories and products. ***We give our merchants immediate access to our global base of over 100 million monthly active users and a comprehensive suite of indispensable services, including*** demand generation and engagement, user-generated content creation, data intelligence, promotional and ***logistics capabilities***, and business operations support, all in a cost-efficient manner.

> *        *        *

> Our global ecommerce platform connects over 100 million monthly active users in over 100 countries to over 550,000 global merchants. ***We seek to democratize ecommerce by making the Wish platform affordable, open, and accessible to all users and merchants worldwide.*** We do this through our relentless focus on product, technology, and data science. For our users, we are revolutionizing the mobile shopping experience by making it affordable, personalized, and entertaining. ***For our merchants, we offer immediate, cost-efficient access to our global user base, scaled data, and technology platform, as well as a comprehensive suite of indispensable services to help run their businesses and drive sales.*** To serve our global and diversified user and merchant base, ***we approach our platform development with a specific geographic focus, tailoring key features to solve for the needs of that locality, and enabling an authentic, localized experience.***

(Emphasis added.)

114.   The 2020 10-K further stated the following, in relevant part, regarding the "[Company's] Financial Model":

> Our business benefits from powerful network effects, fueled by our data advantage and massive scale. ***As more users join Wish, attracted by our affordable value proposition and shopping experience, we are able to increase revenue potential for our merchants. As more merchants succeed on Wish, more merchants join the platform and grow their businesses with***

*Wish, broadening our product selection, which in turn improves user experience.* By developing a strategy focused on users and merchants, we align user and merchant success with the success of our financial model. *The growth in users and merchants generates more data,* further strengthens our data advantage and creates an even better experience for everyone on our platform, in turn *attracting more users and high-quality merchants.*

Our model relies on cost-effectively adding new users, converting those users into buyers and improving engagement and monetization of those buyers on Wish over time as well as adding new merchants, delivering economic success for those merchants, and having those merchants use more of our end-to-end platform.

The following are key elements of our financial model that drive our growth:

- **Increase the scale and growth of our user and buyer base.** *Attracting and engaging users have been our key areas of focus since our founding.* We measure our effectiveness in attracting and engaging users through metrics such as *our MAUs, which increased over 19% from the year ended December 31, 2019 to the year ended December 31, 2020.* This increase has primarily been driven by the growing popularity and recognition of our brand and platform, the user preferences for our differentiated mobile shopping experience, wide selection of attractively priced products, and the success of our promotional and marketing campaigns. As a result, *we have experienced significant revenue growth in recent periods.* We will need to continue to invest in our marketing efforts to attract additional users and buyers and to enhance our brand and drive user engagement, and over time we will need to do this cost-effectively in order to achieve profitability.

(Italicized emphasis added.)

115.   The 2020 10-K also contained the following assertion about the Company's internal controls:

Our management, with the participation of our principal executive officer and principal financial officer, has evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act), as of the end of the period covered by this Annual Report on Form 10-K. *Based on such evaluation, our principal executive officer and principal financial officer have concluded that as of such date, our*

*disclosure controls and procedures were effective at a reasonable assurance level.*

(Emphasis added.)

116.   During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make the materially false and misleading statements contained in the 2020 10-K. Specifically, the statements failed to disclose, *inter alia*, that: (1) ContextLogic did not enjoy the advantages in quality, speed, and reliability that it touted; (2) as a result, the Company was not poised to leverage these supposed advantages as a means of continuing to grow its MAU base; (3) therefore, the Company's MAU base was not likely to grow and instead was likely to shrink, as it ultimately did; and (4) the Company failed to maintain adequate internal controls. As a result of the foregoing, ContextLogic's public statements were materially false and misleading at all relevant times.

### April 28, 2021 Proxy Statement

117.   On April 28, 2021, the Company filed the 2021 Proxy Statement with the SEC. Defendants Szulczewski, Bradley, Emanuel, Lonsdale, Reses, Syed, Tilenius, and Tung solicited the 2021 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[1]

118.   The 2021 Proxy Statement called for Company shareholders to, *inter alia*: (1) reelect Defendants Szulczewski, Bradley, Emanuel, Lonsdale, Reses, Syed, Tilenius, and Tung to the Board; and (2) approve, on an advisory basis, executive compensation for the fiscal year ended December 31, 2020.

---

[1] Plaintiff's allegations with respect to the misleading statements in the 2021 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

119.   The 2021 Proxy Statement described the Audit Committee's risk oversight function as well as its oversight of the Company's internal controls as follows, in relevant part:

> Our Audit Committee assists our Board of Directors' oversight of the quality and integrity of our financial statements; ***our compliance with legal and regulatory requirements***; the qualifications, independence, and performance of our independent registered public accounting firm***; the effectiveness of our internal controls over financial reporting***; and ***risk assessment and risk management***. Among other matters, our Audit Committee's responsibilities include:
>
> •       ***Reviewing and discussing*** with our management and independent registered public accounting firm ***our financial reporting processes and the design, implementation, and maintenance of our internal controls, including the adequacy and effectiveness of those controls and procedures[.]***

(Emphasis added.)

120.   Likewise, with regard to the Compensation Committee's risk oversight function, the 2021 Proxy Statement described the Committee's role in "[m]anaging the risks associated with compensation policies and programs, including an annual review of our risk management processes related to compensation programs[.]"

121.   The 2021 Proxy Statement also described the full Board's role in "Risk Oversight Management," in the following terms:

> Our Board of Directors provides risk oversight for the Company by receiving management presentations, including risk assessments, from all functional areas of the Company, and discussing these assessments with management. In particular, our Board of Directors is responsible for monitoring and assessing strategic risk exposure. Our executive officers are responsible for the day-to-day management of the material risks we face. The risk oversight process includes receiving regular reports from Board committees and members of senior management to enable our Board of Directors to understand our risk identification, risk management, and risk mitigation strategies with respect to areas of potential material risk, including operations, finance, legal, regulatory, cyber security, strategic, and reputational risk. Our Board of Directors administers its oversight function directly as a whole, as well as through various standing committees of our Board of Directors that address

risks inherent in their respective areas of oversight. Our Board of Directors has delegated responsibility related to certain risks to the Audit Committee, the Compensation Committee, and the Nominating and Corporate Governance Committee. The Audit Committee discusses with management and our independent registered public accounting firm our risk management guidelines and policies, our major financial risk exposures, and the steps taken to monitor and control such exposures. The Nominating and Corporate Governance Committee has primary responsibility to oversee risks related to Board structure and composition, and corporate governance.

Our Compensation Committee oversees risks related to our compensation programs, and discusses with management its annual assessment of employee compensation policies and programs. Based upon this review, our Compensation Committee believes that any risks arising from such policies and practices are not reasonably likely to have a material adverse effect on the Company in the future. Specifically, we believe that the elements of our compensation program do not encourage unnecessary or excessive risk taking. Base salaries are fixed in amount, and thus, do not encourage risk taking. A significant proportion of the compensation provided to our executives, and a material amount of the compensation provided to other employees, is in the form of long-term equity awards that are important to help further align employee interests with those of our stockholders. We do not believe that these awards encourage unnecessary or excessive risk taking because the ultimate value of the awards is tied to our stock price, and because awards are subject to long-term vesting schedules to help ensure that employees have significant value tied to long-term stock price performance.

122.   The 2021 Proxy Statement was false and misleading because it failed to disclose that, despite the above representations, the Board, including each of its Committees, was not properly exercising its risk oversight function, leading to the misconduct at issue. This included the Audit Committee not properly exercising oversight over the Company's legal and regulatory compliance, not ensuring the adequacy of the Company's internal controls, and not adequately assessing and managing risk. The Compensation Committee was also not "[m]anaging the risks associated with compensation policies and programs" given that they continued to approve the payment of unjust compensation to the Individual Defendants even as they breached their fiduciary duties to the Company.

123.   Moreover, the 2021 Proxy Statement was also false and misleading in that it failed to disclose that: (1) ContextLogic did not enjoy the advantages in quality, speed, and reliability that it touted; (2) as a result, the Company was not poised to leverage these supposed advantages as a means of continuing to grow its MAU base; (3) therefore, the Company's MAU base was not likely to grow and instead was likely to shrink, as it ultimately did; and (4) the Company failed to maintain adequate internal controls.

124.   As a result of the material misstatements and omissions contained in the 2021 Proxy Statement, Company shareholders reelected Defendants Szulczewski, Bradley, Emanuel, Lonsdale, Reses, Syed, Tilenius, and Tung, allowing them to continue breaching their fiduciary duties to the Company, and approved, on an advisory basis, the compensation of the Company's named executives, including Defendants Szulczewski and Bahri.

**The Truth Fully Emerges**

125.   On May 12, 2021, the Company filed its quarterly report with the SEC on From 10-Q for the fiscal quarter ended March 31, 2021 (the "1Q21 10-Q"). The 1Q21 10-Q revealed that the decline in MAUs, which began in the fourth quarter of 2020, was now a trend, stating in relevant part:

> ***MAUs decreased approximately 7%*** from the three months ended March 31, 2020 to the three months ended March 31, 2021, ***primarily driven by the decision to de-emphasize user acquisition in some emerging markets outside of Europe and North America where we faced logistical challenges*** due to the pandemic and to emphasize higher LTV users within the same value-conscious consumer category in many of the more developed markets.

(Emphasis added.)

126.   Further evidencing the Company's contraction, the Company's sales guidance for the following quarter was now below expectations, with revenue guidance of $715 to $730 million. This was below the $759 million figure which was expected and below the Company's first quarter guidance of $735 to $750 million.

127.   On this news, the Company's stock price declined an additional $3.36 per

share, over a 29% drop, from its May 12, 2021 close of $11.47 per share to close May 13, 2021 at $8.11 per share.

## DAMAGES TO CONTEXTLOGIC

128.   As a direct and proximate result of the Individual Defendants' misconduct, ContextLogic has lost and will continue to lose and expend many millions of dollars.

129.   Such expenditures include, but are not limited to, fees associated with the three Securities Class Actions filed against the Company and the Individual Defendants, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

130.   Additionally, these expenditures include, but are not limited to, lavish compensation, benefits, and other payments provided to the Individual Defendants  who breached their fiduciary duties to the Company.

131.   As a direct and proximate result of the Individual Defendants' conduct, ContextLogic has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

132.   Plaintiff brings this action derivatively and for the benefit of ContextLogic to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as controlling shareholder, directors, and/or officers of ContextLogic, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of the Exchange Act, as well as for contribution under Sections 10(b) and 21D of the Exchange Act.

133.   ContextLogic is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

134.   Plaintiff is, and has been at all relevant times, a shareholder of ContextLogic.

Plaintiff will adequately and fairly represent the interests of ContextLogic in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

135.    Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

136.    A pre-suit demand on the Board of ContextLogic is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following eight individuals: Defendants Szulczewski, Reses, Bradley, Emanuel, Lonsdale, Syed, Tilenius, and Tung (the "Directors"). Plaintiff needs only to allege demand futility as to four of the eight Directors who are on the Board at the time this action is commenced.

137.    Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, while two of them engaged in insider sales, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

138.    In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in the foregoing scheme. The fraudulent scheme were intended to make the Company appear more profitable and attractive to investors. Moreover, the Directors caused the Company to fail to maintain internal controls. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

139.    Additional reasons that demand on Defendant Szulczewski is futile follow. Defendant Szulczewski has served as the Company's CEO since July 2010 and also served as Chairperson of the Board from August 2020 until May 2021. In addition, he founded

the Company in 2010 and is a controlling shareholder, with control over 69.1% of voting power as of April 15, 2021. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Szulczewski with his principal occupation, and he receives handsome compensation as described above. As CEO, Defendant Szulczewski was ultimately responsible for all of the false and misleading statements and omissions that were made during the Relevant Period, including the Registration Statement and 2020 10-K, which he signed; the 2021 Proxy Statement was solicited on his behalf and the false and misleading statements it contained led to his reelection to the Board and the advisory approval of his compensation, despite his undisclosed breaches of fiduciary duties. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, he sold over five million shares of Company common stock while its price was artificially inflated and while he was in possession of material nonpublic information, for proceeds in excess of $105 million. Moreover, Defendant Szulczewski is a defendant in the Securities Class Actions. For these reasons, Defendant Szulczewski breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

140. Additional reasons that demand on Defendant Reses is futile follow. Defendant Reses has served as a Company director since December 2020 and as Executive Chair since May 2021. During the Relevant Period, she also served as a member of the Compensation Committee. As Executive Chair, Defendant Reses is a non-independent director; the Company provides Defendant Reses with her principal occupation for which she receives substantial compensation. She signed the 2020 10-K rendering her personally responsible for the false and misleading statements contained therein; the 2021 Proxy Statement was solicited on her behalf and the false and misleading statements it contained

led to her reelection to the Board, allowing her to continue breaching her fiduciary duties to the Company. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Moreover, she is a defendant in the Securities Class Actions. For these reasons, Defendant Reses breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

141. Additional reasons that demand on Defendant Bradley is futile follow. Defendant Bradley has served as a Company director since October 2020. She also serves as Chair of the Company's Audit Committee. As a director, Defendant Bradley is entitled to significant compensation for her role at the Company. She signed the Registration Statement and the 2020 10-K, rendering her personally responsible for the false and misleading statements contained therein; the 2021 Proxy Statement was solicited on her behalf and the false and misleading statements it contained led to her reelection to the Board, allowing her to continue breaching her fiduciary duties to the Company. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Moreover, Defendant Bradley is a defendant in the Securities Class Actions. For these reasons, Defendant Bradley breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

142. Additional reasons that demand on Defendant Emanuel is futile follow. Defendant Emanuel has served as a Company director since November 2019. He also serves as a member of the Nominating and Corporate Governance Committee. As a director, Defendant Emanuel is entitled to significant compensation for his role at the

Company. He signed the Registration Statement and the 2020 10-K, rendering him personally responsible for the false and misleading statements contained therein; the 2021 Proxy Statement was solicited on his behalf and the false and misleading statements it contained led to his reelection to the Board, allowing him to continue breaching his fiduciary duties to the Company. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, he is a defendant in the Securities Class Actions. For these reasons, Defendant Emanuel breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

143.   Additional reasons that demand on Defendant Lonsdale is futile follow. Defendant Lonsdale has served as a Company director since May 2012. He also serves as a member of the Compensation Committee. As a director, Defendant Lonsdale is entitled to significant compensation for his role at the Company. He signed the Registration Statement and the 2020 10-K, rendering him personally responsible for the false and misleading statements contained therein; the 2021 Proxy Statement was solicited on his behalf and the false and misleading statements it contained led to his reelection to the Board, allowing him to continue breaching his fiduciary duties to the Company. In addition, he engaged in an insider sale during the Relevant Period while the price of the Company's common stock was artificially inflated and he was in possession of material nonpublic information. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, he is a defendant in the Securities Class Actions. For these reasons, Defendant Lonsdale breached his fiduciary duties, faces a substantial likelihood of liability, is not independent

or disinterested, and thus demand upon him is futile and, therefore, excused.

144.   Additional reasons that demand on Defendant Syed is futile follow. Defendant Syed has served as a Company director since October 2016 and as Lead Independent Director since December 2020. He also serves as Chair of both the Compensation Committee and the Nominating and Corporate Governance Committee. As a director, Defendant Syed is entitled to significant compensation for his role at the Company. He signed the Registration Statement and the 2020 10-K, rendering him personally responsible for the false and misleading statements contained therein; the 2021 Proxy Statement was solicited on his behalf and the false and misleading statements it contained led to his reelection to the Board, allowing him to continue breaching his fiduciary duties to the Company. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, he is a defendant in the Securities Class Actions. For these reasons, Defendant Syed breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

145.   Additional reasons that demand on Defendant Tilenius is futile follow. Defendant Tilenius has served as a Company director since August 2020. She also serves as a member of both the Audit Committee and the Nominating and Corporate Governance Committee. As a director, Defendant Tilenius is entitled to significant compensation. She signed the Registration Statement and the 2020 10-K, rendering her personally responsible for the false and misleading statements contained therein; the 2021 Proxy Statement was solicited on her behalf and the false and misleading statements it contained led to her reelection to the Board, allowing her to continue breaching her fiduciary duties to the Company. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously

disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Moreover, Defendant Tilenius is a defendant in the Securities Class Actions. For these reasons, Defendant Tilenius breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

146. Additional reasons that demand on Defendant Tung is futile follow. Defendant Tung has served as a Company director since January 2014. He also serves as a member of both the Audit Committee and the Compensation Committee. As a director, Defendant Tung is entitled to significant compensation for his role at the Company. He signed the Registration Statement and the 2020 10-K, rendering him personally responsible for the false and misleading statements contained therein; the 2021 Proxy Statement was solicited on his behalf and the false and misleading statements it contained led to his reelection to the Board, allowing him to continue breaching his fiduciary duties to the Company. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, he is a defendant in the Securities Class Actions. For these reasons, Defendant Tung breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

147. Additional reasons that demand on the Board is futile follow.

148. The Directors have longstanding business and personal relationships with each other and the Company that preclude them from acting independently and in the best interests of the Company and the shareholders. For example, Defendants Szulczewski and Lonsdale have worked together at the Company for nearly a decade, since Defendant Lonsdale joined the Board in 2012. Defendants Tung and Syed have also worked with them

for a substantial period of time, having joined the Company in 2014 and 2016, respectively. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, demand upon the Directors would be futile.

149.    Defendants Bradley, Tilenius, and Tung (the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants are responsible for overseeing, among other things, the quality and integrity of the Company's financial statements and related disclosures, the Company's compliance with laws and regulations, the Company's risk exposure, and the Company's system of internal controls. The Audit Committee Defendants failed to ensure the integrity of the Company's financial statements and related disclosures, failed to ensure compliance with laws and regulations, failed to adequately oversee risk, and failed to monitor the Company's internal controls as they are charged to do under the Audit Committee Charter. Moreover, the Audit Committee to prevent the Company from issuing false and misleading financial statements with the SEC. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

150.    Defendants Lonsdale, Syed, Tung, and Reses (the "Compensation Committee Defendants") served as members of the Compensation Committee during the Relevant Period and approved excessive compensation for the Individual Defendants. The Compensation Committee Defendants engaged in the scheme to issue false and misleading statements and not only failed to take action to correct or prevent it but rewarded it. They failed to uphold their responsibilities with integrity and rewarded the Individual Defendants for their misconduct. Thus, the Compensation Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

151.    Demand in this case is further excused because the Directors are beholden to and controlled by Defendant Szulczewski, who is founder, CEO, former Chairperson, and

a controlling shareholder with control over 69.1% of the Company's voting power through his beneficial ownership 62.9% of the Company's outstanding Class B common stock and irrevocable voting proxies giving him control of additional stock. In light of this of this, the Directors cannot impartially consider a demand against Defendant Szulczewski, an interested, primary wrongdoer, as they are dependent on him for their continued employment with the Company and the lucrative compensation that goes with that; this is particularly true of Defendant Reses who is also an executive at ContextLogic. Thus, the Directors are unable to evaluate a demand with disinterest or independence as a result of Defendant Szulczewski's control over them.

152.   In violation of the Code of Conduct, the Directors conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act. In further violation of the Code of Conduct, the Directors failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct. In additional violation of the Code of Conduct, two of the Directors, Defendants Szulczewski and Lonsdale engaged in insider trading. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

153.   ContextLogic has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for ContextLogic any part of the damages ContextLogic suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

154.   The Individual Defendants' conduct described herein and summarized above

could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

155.    The acts complained of herein constitute violations of fiduciary duties owed by ContextLogic's officers and directors, and these acts are incapable of ratification.

156.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of ContextLogic. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of ContextLogic, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

157.    If there is no directors' and officers' liability insurance, then the Directors will not cause ContextLogic to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

158.   Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## **FIRST CLAIM**
### **Against the Directors for Violations of Section 14(a) of the Exchange Act**

159.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

160.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

161.   Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

162.   Under the direction and watch of the Directors, the 2021 Proxy Statement failed to disclose that the Board, including each of its Committees, was not properly

exercising its risk oversight function, leading to the misconduct at issue. This included the Audit Committee not properly exercising oversight over the Company's legal and regulatory compliance, not ensuring the adequacy of the Company's internal controls, and not adequately assessing and managing risk. The Compensation Committee, too, was not "[m]anaging the risks associated with compensation policies and programs" given that they continued to approve the payment of unjust compensation to the Individual Defendants even as they breached their fiduciary duties to the Company. The 2021 Proxy Statement further failed to disclose that: (1) ContextLogic did not enjoy the advantages in quality, speed, and reliability that it touted; (2) as a result, the Company was not poised to leverage these supposed advantages as a means of continuing to grow its MAU base; (3) therefore, the Company's MAU base was not likely to grow and instead was likely to shrink, as it ultimately did; and (4) the Company failed to maintain adequate internal controls. As a result, the 2021 Proxy Statement was materially false and misleading.

163.   In the exercise of reasonable care, the Directors should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2021 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2021 Proxy Statement, including but not limited to, the election of the Directors and the advisory approval of compensation for the Company's named executive officers, including Defendants Szulczewski and Bahri.

164.    The false and misleading elements of the 2021 Proxy Statement led to, among other things, the reelection of the Directors, which allowed them to continue to breach their fiduciary duties to ContextLogic. The false and misleading elements of the 2021 Proxy Statement also led the Company's shareholders to approve, in an advisory capacity, executive compensation for, *inter alia*, Defendants Szulczewski and Bahri despite their breaches of fiduciary duty and other violations of law.

165.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2021 Proxy Statement.

166.    Plaintiff, on behalf of ContextLogic, has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

167.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

168.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of ContextLogic's business and affairs.

169.    Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

170.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of ContextLogic.

171.    In breach of their fiduciary duties owed to ContextLogic, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or

misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) ContextLogic did not enjoy the advantages in quality, speed, and reliability that it touted; (2) as a result, the Company was not poised to leverage these supposed advantages as a means of continuing to grow its MAU base; (3) therefore, the Company's MAU base was not likely to grow and instead was likely to shrink, as it ultimately did; and (4) the Company failed to maintain adequate internal controls. As a result of the foregoing, ContextLogic's public statements were materially false and misleading at all relevant times.

172.   The Individual Defendants failed to correct and/or caused the Company to fail to correct the false and misleading statements and omissions of material fact, while four of them sold shares at artificially inflated price during the Relevant Period, rendering them personally liable to the Company for breaching their fiduciary duties.

173.   Also in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

174.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of ContextLogic's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

175.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

176.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, ContextLogic has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

177.   Plaintiff on behalf of ContextLogic has no adequate remedy at law.

## THIRD CLAIM

### Against the Individual Defendants for Unjust Enrichment

178.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

179.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense, and to the detriment, of ContextLogic.

180.   The Individual Defendants benefitted financially from the improper conduct; received bonuses, stock options, or similar compensation from ContextLogic that was tied to the performance or artificially inflated valuation of ContextLogic; or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

181.   Plaintiff, as a shareholder and a representative of ContextLogic, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breaches of their fiduciary and contractual duties.

182.   Plaintiff on behalf of ContextLogic has no adequate remedy at law.

## FOURTH CLAIM

### Against the Individual Defendants for Abuse of Control

183.   Plaintiff incorporates by reference and realleges each and every allegation set

forth above, as though fully set forth herein.

184.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence ContextLogic, for which they are legally responsible.

185.   As a direct and proximate result of the Individual Defendants' abuse of control, ContextLogic has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

186.   Plaintiff on behalf of ContextLogic has no adequate remedy at law.

## FIFTH CLAIM

### Against the Individual Defendants for Gross Mismanagement

187.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

188.   By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of ContextLogic in a manner consistent with the operations of a publicly-held corporation.

189.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, ContextLogic has sustained and will continue to sustain significant damages.

190.   As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

191.   Plaintiff on behalf of ContextLogic has no adequate remedy at law.

## SIXTH CLAIM

### Against the Individual Defendants for Waste of Corporate Assets

192.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

193.   The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the

Company.

194.   As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused ContextLogic to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

195.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

196.   Plaintiff on behalf of ContextLogic has no adequate remedy at law.

## SEVENTH CLAIM
### Against the Individual Defendants for Contribution
### Under Sections 10(b) and 21D of the Exchange Act

197.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

198.   ContextLogic, and the Individual Defendants are named as defendants in each of the Securities Class Actions, which assert claims under the federal securities laws for, *inter alia*, violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Actions for these violations of the federal securities laws, the Company's liability will be in whole or in part due to the Individual Defendants' willful and/or reckless violations of their obligations as controlling shareholder, officers, and/or directors of ContextLogic.

199.   The Individual Defendants because of their positions of control and authority as controlling shareholder, directors, and/or officers were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of ContextLogic, including the wrongful acts complained of herein and in the Securities Class Actions.

200.   Accordingly, the Individual Defendants are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange

Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

201.   As such, ContextLogic is entitled to receive all appropriate contribution or indemnification from the Individual Defendants.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)   Declaring that Plaintiff may maintain this action on behalf of ContextLogic, and that Plaintiff is an adequate representative of the Company;

(b)   Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to ContextLogic;

(c)   Determining and awarding to ContextLogic the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)   Directing ContextLogic and the Individual Defendants to take all necessary actions to reform and improve ContextLogic's corporate governance and internal procedures to comply with applicable laws and to protect ContextLogic and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of ContextLogic to nominate at least four candidates for election to the Board;

3. a proposal to ensure the establishment of effective oversight of

compliance with applicable laws, rules, and regulations;

      (e)    Awarding ContextLogic restitution from Individual Defendants and each of them;

      (f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

      (g)    Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: August 13, 2021          Respectfully submitted,

                          **THE BROWN LAW FIRM, P.C.**

                            s/Robert C. Moest          .
                          Robert C. Moest, Of Counsel, SBN 62166
                          2530 Wilshire Boulevard, Second Floor
                          Santa Monica, California 90403
                          Telephone: (310) 915-6628
                          Facsimile: (310) 915-9897
                          Email: RMoest@aol.com

                          **THE BROWN LAW FIRM, P.C.**
                          Timothy Brown
                          767 Third Avenue, Suite 2501
                          New York, NY 10017
                          Telephone: (516) 922-5427
                          Facsimile: (516) 344-6204
                          Email: tbrown@thebrownlawfirm.net

                          *Counsel for Plaintiff*

## **VERIFICATION**

I, Yashasvi Patel a plaintiff in the within action. I have reviewed the allegations made in this verified consolidated shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _th day of __8/13/2021__, 2021.

_Yashasvi Patel_

Yashasvi Patel